CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
GEORGINA WAKEFIELD (Bar No. 282094)
(E-Mail: Georgina_Wakefield@fd.org)
GABRIELA RIVERA (Bar No. 283633)
(E-Mail: Gabriela_Rivera@fd.org)
JULIA DEIXLER (Bar No. 301954)
(E-Mail: Julia_Deixler@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
JERRY NEHL BOYLAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JERRY NEHL BOYLAN, <br><br> Defendant. | Case No. 20-CR-600-GW <br><br> **MOTION TO DISMISS INDICTMENT FOR FAILURE TO ALLEGE GROSS NEGLIGENCE** <br><br> August 18, 2022 at 8:00 a.m. <br><br> The Honorable George H. Wu |

Jerry Nehl Boylan, through his attorneys of record, Deputy Federal Public Defenders Georgina Wakefield, Gabriela Rivera, and Julia Deixler, hereby moves this Honorable Court for an order dismissing the indictment for failing to allege an essential element of the offense of seaman's manslaughter, 18 U.S.C. § 1115.

/ /

/ /

/ /

This motion is based upon the attached memorandum of points and authorities, all files and records in this case, and such evidence and argument as may be presented at the hearing on the motion.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  June 30, 2022          By  */s/ Georgina Wakefield*

GEORGINA WAKEFIELD
GABRIELA RIVERA
JULIA DEIXLER
Deputy Federal Public Defenders
Attorneys for JERRY NEHL BOYLAN

2

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL STATEMENT ............................................................................................ 1

III. LEGAL ARGUMENT .................................................................................................. 6

    A.    The indictment must contain every element of the offense charged ........... 6

    B.    Consistent precedent requires an indictment charging manslaughter or negligent homicide to allege gross negligence ............................................ 8

    C.    Seaman's manslaughter does not create a lower threshold of culpable conduct than other manslaughter or negligent homicide statutes .............. 10

IV. CONCLUSION ........................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Barbeau v. United States*,
   193 F.2d 945 (9th Cir. 1951) ...............................................................*passim*

*Elonis v. United States*,
   575 U.S. 723 (2015)............................................................................16

*Hamling v. United States*,
   418 U.S. 87, 117 (1975) ......................................................................7

*In re Larry's Apartment, L.L.C.*,
   249 F.3d 832 (9th Cir. 2001) ...............................................................12

*Morissette v. United States*,
   342 U.S. 246 (1952)........................................................................13, 14

*Ruan v. United States*,
   --- S. Ct. ---, No. 20-1410, 2022 WL 2295024 (U.S. June 27, 2022) ......16

*Russell v. United States*,
   369 U.S. 749 (1962)..........................................................................6, 7

*Staples v. United States*,
   511 U.S. 600 (1994)........................................................................13, 14

*United States v. Alvarez*,
   809 Fed. Appx. 562 (11th Cit. 2020) (unpublished) ...........................11, 12

*United States v. Collyer*,
   25 F. Cas. 554 (S.D.N.Y. 1855) ...........................................................16

*United States v. Crowe*,
   563 F.3d 969 (9th Cir. 2009) ................................................................8

*United States v. Du Bo*,
   186 F.3d 1177 (9th Cir. 1999) ..............................................................7

*United States v. Escamilla*,
   467 F.2d 341 (4th Cir. 1972) ...............................................................17

*United States v. Farnham*,
   25 F. Cas. 1042 (S.D.N.Y. 1853) .........................................................16

ii

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Garcia,*
    729 F.3d 1171 (9th Cir. 2013) ................................................................ 1, 8, 9, 17

*United States v. Hanousek,*
    176 F.3d 1116 (9th Cir.1999) ........................................................................ 14

*United States v. Hilger,*
    867 F.2d 566 (9th Cir. 1989) ......................................................................... 10

*United States v. Hilger,*
    No. CR 87-803-JPV, ECF No. 50 (N.D. Cal. March 10, 1988) .................... 10

*United States v. Keith,*
    605 F.2d 462 (9th Cir. 1979) ................................................................. *passim*

*United States v. Keller,*
    19 F. 633 (D. W. Va. 1884) ........................................................................... 17

*United States v. O'Keefe,*
    426 F.3d 274 (5th Cir. 2005) ...................................................... 11, 12, 15, 16

*United States v. Pardee,*
    368 F.2d 368 (4th Cir. 1966) ................................................................ 9, 14, 15

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000) .............................................................................. 7

*United States v. Resendiz-Ponce,*
    549 U.S. 102 (2007).......................................................................................... 7

*United States v. Shortman,*
    91 F.3d 80 (9th Cir. 1996) ............................................................................... 8

*United States v. Thurston,*
    362 F.3d 1319 (11th Cir. 2004) ..................................................................... 11

*United States v. Thurston,*
    No. 2:02-cr-121-29, ECF No. 65 (M.D. Fla. June 10, 2003) ........................ 11

*United States v. Warner,*
    28 F. Cas. 404 (D. Ohio 1848) ...................................................................... 16

*Van Schaick v. United States,*
    159 F. 847 (2d Cir. 1908) .............................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Constitutional Provisions, Statutes and Rules**

18 U.S.C. § 1112................................................................................*passim*

18 U.S.C. § 1115................................................................................*passim*

49 U.S.C. § 1131......................................................................................5

Fed. R. Crim. P. 7....................................................................................7

U.S. Const., amend. V..............................................................................6

U.S. Const., amend. VI..........................................................................6, 7

**Other Authorities**

Herbert Wechsler, *Codification of Criminal Law in the United States: The Model Penal Code*, 68 Colum. L. Rev. 1425, 1438 (1968)......................14

Model Penal Code § 2.02(2)(d) ........................................................13, 14

*Negligence*, Black's Law Dictionary (11th ed. 2019) ................................13

NTSB Marine Accident Report (Oct. 20, 2020), *available at* https://www.ntsb.gov/investigations/AccidentReports/Reports/MAR20 03.pdf........................................................................................*passim*

## I.  INTRODUCTION

Jerry Boylan is charged with 34 counts of seaman's manslaughter, in violation of 18 U.S.C. § 1115.  But the indictment fails to allege every essential element of the offense.  Specifically, the indictment fails to allege that Mr. Boylan acted in gross negligence.  Under a long line of Ninth Circuit decisions, manslaughter and other negligent homicide charges require "proof beyond a reasonable doubt that the defendant acted with gross negligence."  *United States v. Garcia*, 729 F.3d 1171, 1175 (9th Cir. 2013).  This consistent precedent is based on fundamental common law principles that apply equally to the seaman's manslaughter statute at issue here.  Indeed, the only court in this Circuit that has addressed the standard of care for seaman's manslaughter dismissed the indictment without prejudice because it failed to allege gross negligence.  This Court should do the same.

## II.  FACTUAL STATEMENT[1]

Jerry Boylan was the captain of the Conception, a 75-foot passenger boat owned by the Fritzler Family Trust and operated by Mr. Boylan's employer, Truth Aquatics, Inc.  In the early morning of August 31, 2019, the Conception left for a scuba diving trip with 33 passengers and six Truth Aquatics employees, including Mr. Boylan, on board.[2]

---

[1] These facts are based on the government's discovery and the publicly available NTSB Marine Accident Report (hereinafter "NTSB") (Oct. 20, 2020), *available at* https://www.ntsb.gov/investigations/AccidentReports/Reports/MAR2003.pdf (last accessed Jun. 30, 2022). The defense includes this recitation of events not because it concedes the truth of these facts, but to give the Court background about the general legal issues.

[2] Truth Aquatics manned that trip and all other overnight trips as follows: one captain, one second captain, two deckhands, and two galley hands. The galley hands were responsible for preparing meals for passengers, while the deckhands and captains were responsible for boat operations.

On the second night of the trip, September 1, the boat anchored overnight at Platts Harbor on Santa Cruz Island.[3] 33 passengers and one crewmember slept below deck in the bunkroom. In the early hours of the morning on September 2, one of the galley hands, Michael Kohls, woke up and cleaned the galley or kitchen located on the boat's main deck.[4] He did not observe anything amiss and saw no signs of smoke or fire at that time. He used the restroom on the main deck and went back to sleep in the wheelhouse on the upper deck for approximately 25 minutes until he and the other galley hand, Ryan Sims, awoke to strange noises. Mr. Kohls investigated the sounds and discovered a fire consuming portions of the main deck.[5]

Because the stairs down to the main deck were blocked by fire, Mr. Boylan directed Mr. Molitor and Mr. French to jump down from the wheelhouse to the main deck.[6] He directed Mr. Sims to retrieve the fire extinguisher from a cabinet in the wheel house two times, but Mr. Sims was overwhelmed by smoke and he started gagging and coughing and was unable to retrieve it.[7]

Mr. Boylan used the radio in the wheelhouse to alert the Coast Guard to the fire. At approximately 3:14 a.m., the Coast Guard received the first distress call from Mr. Boylan. He yelled, "Mayday, Mayday, Mayday. Conception, Platts Harbor, north side Santa Cruz." When Coast Guard Sector Los Angeles/Long Beach responded to the distress call, Mr. Boylan transmitted, "39 P-O-B [passengers on board]. I can't breathe. 39 P-O-B. Platts."[8]

---

[3] NTSB at vi ("The vessel was anchored in Platts Harbor on the north side of Santa Cruz Island, 21.5 nautical miles south-southwest of Santa Barbara, California").

[4] NTSB at 10.

[5] *Id*.

[6] *Id*. ("the second captain and the first deckhand were instructed by the captain to lower themselves to the main deck via the wheelhouse wing stations").

[7] Ex. C at Bates 92224-25 (excerpt of Ryan Sims interview transcript).

[8] NTSB at 11.

2

The smoke filling the wheelhouse overcame Mr. Boylan. He jumped into the water from the wheelhouse, then swam and reboarded the boat at its rear. As Mr. Boylan jumped, smoke trailed from his body and other crewmembers believed he was on fire.[9]

On the main deck, crew members tried in vain to rescue passengers. Deckhand Milton French and Second Captain Cullen Molitor tried to pry open a galley window on the main deck.[10] They were unable to open it. Mr. French attempted to find another way to reach passengers. He opened the anchor locker hatch on the bow. Looking inside, he saw that there was no access to the shower room and bunkroom below. Mr. French also checked the port and starboard exterior passageways, and both were blocked by smoke and flames, which prevented him from accessing the boat's firefighting hoses.[11]

When Mr. Sims jumped to the main deck, he badly broke his leg. Mr. Kohls attended to him and made sure he was able to get off the boat. Mr. Kohls and Mr. Sims swam away from the vessel.[12]

After jumping into the water, Mr. Boylan, Mr. Molitor, and Mr. French swam to the stern of the boat. By that time, the entire deckhouse was consumed by flames. The escape exit for the passengers was fully engulfed. Mr. Molitor opened the hatch to the engine room but was blocked from entering by black smoke.[13]

Mr. French went up onto the back deck of the dive boat to once again look for a way to help any passengers. The fire had continued to consume the vessel, and he found no way to get into the salon or to the bunkroom below. The fire continued to prevent Mr. French from accessing the firefighting equipment. He next attempted to

---

[9] *Id.*
[10] *Id.*
[11] *Id.* at 12.
[12] *Id.*
[13] *Id.*

3

enter the engine room where there was another water source for the firefighting hoses.[14] He was met with thick black smoke that prevented him from turning on the water. He also contemplated jumping into the flames to try to reach the passengers.

The boat now nearly fully engulfed by flames, Mr. Boylan, Mr. French, and Mr. Molitor got into an inflatable skiff at the stern of the boat and rescued Mr. Kohls and Mr. Sims. They boarded a fishing boat called the Grape Escape, which was anchored nearby to use the radio to again call the Coast Guard for help. By this time, the Conception was entirely engulfed in flames from bow to stern.[15] Over the next hour, Mr. Molitor and Mr. French used the skiff to circle the burning Conception in an attempt to rescue any surviving passengers. Mr. Molitor reported hearing several explosions.[16] Mr. Boylan stayed on the radio with the Coast Guard and provided them with information for the firefighting and rescue efforts.

At about 4:27 a.m., two Coast Guard vessels arrived. One of the vessels had members of the Ventura County Fire Department. The fire captain determined that the firefighting equipment on board was not worth using to attempt to fight the fire given the condition.[17] The vessels instead focused on searching for survivors and treating Mr. Sims' broken leg.[18]

---

[14] *Id.*

[15] The owners of the fishing boat described the Conception at this time as "completely on fire from one end to the other. It was already completely engulfed. There wasn't a spot on that boat that wasn't on fire." *Id.*

[16] *Id.* at 14.

[17] In radio transmissions, the on-scene coordinator said, "my fire captain on board is advising that our equipment on the Coast Guard boats is not even worth putting on the fire based on the color and what he's looking at." The transmission is identified as Bates 00055714 in the government's discovery production. In another transmission he said that the fire captain "is advising there is nothing we can do for the fire. He is advising that we let it burn." That transmission is identified as Bates 0005714 in the government's discovery production. *See also* NTSB at 17.

[18] NTSB at 17.

4

At about 4:55 a.m., two boats with high pump capacity and firefighting foam arrived. The first boat used every gallon of foam on board, but it was unable to fully suppress the fire. The fire continued to re-flash.[19] At approximately 6:54 a.m., the Conception sank stern first. First responders were never able to safely board the vessel, and no survivors were found.[20] 33 passengers and 1 crewmember tragically perished.

The United States Attorney's Office led a criminal investigation with the Coast Guard Investigative Service (CGIS), the FBI, and the ATF. The National Transportation Safety Board (NTSB) also conducted an investigation, as required under 49 U.S.C. § 1131(a)(1)(E).  The NTSB determined that the probable cause of the accident was the failure of Truth Aquatics to effectively oversee its vessel and crewmember operations, including by failing to require a designated night patrol on any of the three vessels it operated.[21]  In reviewing the company's policies and procedures, the NTSB concluded that Truth Aquatics had been deviating from required safe practices for some time.[22] According to the NTSB, the lack of a USCG regulatory requirement for smoke detection in all accommodation spaces contributed to the accident.[23] Further, although the Conception was "designed in accordance with the regulations" in place at the time, that design contributed to the loss of life; there were

---

[19] In a radio transmission, the on-scene coordinator said, "Fire Boat number 3 has expended all its 'A triple F,' they have been using 'A triple F' this entire time." AFFF stands for Aqueous Film Forming Foam. It is a fire suppressing foam used to extinguish flammable liquid fires such as fuel fires. The transmission is identified as Bates 00055981 in the government's discovery production.

[20] NTSB at 17.

[21] *Id*. at vi-vii. The NTSB interviewed captains and crewmembers from other Truth Aquatics vessels, and none had a designated night watch. A captain of another Truth Aquatics vessel stated "he had followed the practice that was shown to him when he began working for Truth Aquatics, and he thought 'the boat's been operating this way for so long successfully after so many [Coast Guard] inspections that it must be fine.'" *Id*. at 38.

[22] *Id*. at vii-viii.

[23] *Id*. at vii.

5

inadequate escape arrangements from the vessel's bunkroom, as both exits led to the same compartment that was engulfed in fire, thereby preventing escape or rescue.[24]

Over a year after the accident, the government filed a 34-count indictment charging Mr. Boylan with seaman's manslaughter, a violation of 18 U.S.C. § 1115. ("Indictment," ECF No. 1).  Section 1115 provides, in relevant part, that "[e]very captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed . . . shall be fined under this title or imprisoned not more than ten years, or both."  18 U.S.C. § 1115.  The indictment alleges that Mr. Boylan "caused the deaths" of 34 individuals "by his misconduct, negligence, and inattention to his duties." (Indictment at 3).  The indictment does not allege that Mr. Boylan acted with gross negligence.

## III.  LEGAL ARGUMENT

### A.   The indictment must contain every element of the offense charged

The Fifth Amendment guarantees that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."  If the indictment does not state the essential elements of the crime, Mr. Boylan cannot be assured that he is being tried on the evidence presented to the grand jury or that the grand jury acted properly in indicting him. *Russell v. United States*, 369 U.S. 749, 768–770 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure.").

Similarly, the Sixth Amendment's right "to be informed of the nature and cause of the accusation" is also offended by an indictment that does not state the essential

---

[24] *Id*. at viii.

elements of the crime. *See Russell*, 369 U.S. at 761. The indictment must provide Mr. Boylan with enough information so that he can prepare his defense. *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1975)). And the indictment must protect against double jeopardy, so it must be specific enough to enable Mr. Boylan to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Resendiz-Ponce*, 549 U.S. at 108 (citing *Hamling*, 418 U.S. at 117).

Federal Rule of Criminal Procedure 7 ensures fulfillment of these constitutionally required functions by requiring that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

While it is generally sufficient for an indictment to track the language of the statute, when an element of the offense is implicit in the statute, rather than explicit, the indictment must nonetheless allege the implicit element explicitly. *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999); *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000). And when an indictment fails to allege an implicit element, it must be dismissed without prejudice. *United States v. Keith*, 605 F.2d 462, 463–65 (9th Cir. 1979) (ordering dismissal of manslaughter indictment for failing to allege implicit element of gross negligence).

7

**B.    Consistent precedent requires an indictment charging manslaughter or negligent homicide to allege gross negligence**

The Ninth Circuit has "consistently held that involuntary manslaughter requires proof beyond a reasonable doubt that the defendant acted with gross negligence." *United States v. Garcia*, 729 F.3d 1171, 1175 (9th Cir. 2013), *as amended* (Aug. 13, 2013); *see also United States v. Crowe*, 563 F.3d 969, 973 (9th Cir. 2009); *United States v. Shortman*, 91 F.3d 80, 81 (9th Cir. 1996); *Barbeau v. United States*, 193 F.2d 945, 948-49 (9th Cir. 1951).  An indictment charging manslaughter or negligent homicide that fails to allege gross negligence must be dismissed for failing "to detail each element of the charged offense."  *United States v. Keith*, 605 F.2d 462, 463–65 (9th Cir. 1979) (dismissing manslaughter indictment).  While these cases address other manslaughter or negligent homicide statutes, they are based on fundamental common law principles that apply equally to the seaman's manslaughter statute at issue here.

The Ninth Circuit first read the gross negligence element into the general federal manslaughter statute, 18 U.S.C. § 1112, in *Keith*.  *See Keith*, 605 F.2d at 464.  *Keith* held that while the element was not obviously required under the plain language of the statute, it was nonetheless an essential element of the charge.  *See id*.  Section 1112 defines involuntary manslaughter as the "unlawful killing of a human being without malice . . . . In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."  18 U.S.C. § 1112; *see also See Keith*, 605 F.2d at 463.  The text's standard of care—"without due caution and circumspection"—does not plainly require gross negligence, but *Keith* held that the statute includes a gross negligence element based on common law principles applying to any manslaughter charge.  *See id.* at 463-64 & n.2.  The Ninth Circuit has since clarified that this gross negligence requirement applies to every form of § 1112 violation, whether it be a death caused by "the commission of an unlawful act not amounting to a felony" or the

commission of a lawful act "in an unlawful manner, or without due caution and circumspection." *Garcia*, 729 F.3d at 1175–77 (reversing conviction because jury instruction failed to clearly require gross negligence as to "unlawful act" manslaughter). That is, despite the statute's disjunctive phrasing and lack of a clear gross negligence requirement, the Ninth Circuit has held that any manslaughter charge under § 1112 requires gross negligence.

In *Keith*, the Ninth Circuit relied largely on *United States v. Pardee*, 368 F.2d 368 (4th Cir. 1966), and *Barbeau v. United States*, 193 F.2d 945 (9th Cir. 1951), which both addressed the longstanding principle that criminal negligence—especially in the homicide context—is limited to gross negligence. *Pardee* is the leading case holding that § 1112 requires gross negligence, and its reasoning was based on "the fundamentals of involuntary manslaughter," not on § 1112 specifically. *Pardee*, 368 F.2d at 374. Under those fundamental principles, "a charge of manslaughter by negligence is not made out by proof of ordinary simple negligence that would constitute civil liability." *Id.* (citation omitted). Instead, "the amount or degree or character of the negligence to be proven in a criminal case is gross negligence." *Id.* (citation omitted). The court concluded that the standard of care in § 1112—"without due caution and circumspection"— "was not intended to deviate from the universal concept of the crime [of manslaughter]." *Id.* at 373. It therefore held that § 1112 requires proof of gross negligence, *id.*, which is the holding adopted by the Ninth Circuit in *Keith*, 605 F.2d at 464.

In *Barbeau*, the Ninth Circuit reviewed a conviction under an Alaska statute titled "Negligent homicide," which criminalized "culpable negligence" resulting in death. *Barbeau*, 193 F.2d at 948 (quoting statute). Although the statute's text simply criminalized "culpable negligence," the Court concluded that the trial court had "properly instructed the jury that in order to convict Barbeau of manslaughter by culpable negligence it must find 'negligence of such a degree, so gross and wanton, as

9

to be deserving of punishment." *Id.* at 948-49 (quoting district court).  The Court continued, "Culpable negligence is something more than the slight negligence necessary to support a civil action for damages.'" *Id.* (quoting district court).

In short, the Ninth Circuit has consistently held that manslaughter and negligent homicide charges require proof of gross negligence, even where the charged statutes refer only to "negligence."  These holdings apply across different manslaughter statutes based on the bedrock common law principle that criminal negligence requires a greater degree of culpability than the ordinary negligence sufficient to sustain a civil tort claim.

**C.    Seaman's manslaughter does not create a lower threshold of culpable conduct than other manslaughter or negligent homicide statutes**

The consistent precedents holding that manslaughter and negligent homicide statutes require proof of gross negligence apply equally to the seaman's manslaughter statute, § 1115.  Indeed, the only court within this Circuit that has addressed the standard of care for seaman's manslaughter dismissed the indictment because it failed to allege gross negligence.  *United States v. Hilger*, No. CR 87-803-JPV, ECF No. 50 (N.D. Cal. March 10, 1988) (transcript of hearing and order dismissing indictment, attached as "Ex. A"); *see also United States v. Hilger*, 867 F.2d 566, 566 (9th Cir. 1989) (affirming dismissal on other grounds, without addressing degree of negligence required).  The two out-of-circuit decisions that have reached contrary conclusion are unpersuasive.  *Hilger* correctly interpreted fundamental common law principles and the text of the seaman's manslaughter statute in concluding that it includes a gross negligence element.  This Court should follow suit.

In *Hilger*, the district court correctly concluded that seaman's manslaughter requires proof of gross negligence.  At a hearing on the motion, the defense argued that as a manslaughter statute, § 1115 includes an element requiring gross negligence. (Ex. A at 3-4 (transcript of *Hilger* motions hearing and order).)  The Government argued that the caselaw requiring gross negligence regards § 1112, and that in § 1115

10

Congress set a lower threshold for the standard of care, namely "misconduct, negligence, or inattention to his duties." (Ex. A at 4-5.) The Court pointed out that the same reasoning applies to § 1112, which by its text does not require gross negligence and instead requires proof of conduct "without due caution and circumspection." Despite this broad language, the Court of Appeals has consistently ruled that, as a manslaughter statute, § 1112 implicitly includes an element requiring proof of gross negligence. (Ex. A at 6-7.) The *Hilger* court therefore concluded that § 1115 also includes a gross negligence element and dismissed the indictment for failing to allege that essential element. (Ex. A at 14-15; *see also* Ex. B (written order dismissing indictment).)

At least one other district court has dismissed an § 1115 indictment for failing to allege gross negligence. *See United States v. Thurston*, No. 2:02-cr-121-29, ECF No. 65 (M.D. Fla. June 10, 2003) (order dismissing indictment); *United States v. Thurston*, 362 F.3d 1319, 1321–22 (11th Cir. 2004) (stating that district court had dismissed original indictment for failing to allege gross negligence, and denying appeal based on double jeopardy claim after government re-indicted with the correct elements).

On the other side of the ledger, two out-of-circuit decisions have indicated that § 1115 requires only ordinary negligence, but neither decision is persuasive. *See United States v. Alvarez*, 809 Fed. Appx. 562, 569 (11th Cit. 2020) (unpublished); *United States v. O'Keefe*, 426 F.3d 274, 277-79 (5th Cir. 2005). In *Alvarez*, the Eleventh Circuit issued an unpublished decision rejecting the defendant's argument that § 1115 is facially unconstitutional since it "criminalizes simple negligence." *Alvarez*, 809 F. App'x at 564 & 567-69. The Court noted that the "plain language of the statute [] criminalizes simple negligence" and held that Congress has the constitutional authority to set criminal liability based on negligence. *Id.* at 567-68. *Alvarez* offers little insight into the question presented here; the defendant there never argued that the statute requires gross negligence—he instead premised his appeal on the notion that it

11

1  criminalizes simple negligence.  *See id*. at 564 & 567-69; Brief for Appellant at 16-24,

2  *United States v. Alvarez*, 809 Fed. Appx. 562 (11th Cit. 2020) (No. 18-15084) (arguing

3  that § 1115 requires only simple negligence and that such a low standard of care for a

4  manslaughter charge is facially unconstitutional).  The Court was thus not presented

5  with any authorities showing why gross negligence applies, nor did the court have an

6  opportunity to decide the issue.  The statute's standard of care was thus a question

7  "lurk[ing] in the record, neither brought to the attention of the court nor ruled upon."  *In*

8  *re Larry's Apartment, L.L.C.*, 249 F.3d 832, 839 (9th Cir. 2001).

9       In *O'Keefe*, a panel of the Fifth Circuit more directly ruled on the issue presented

10  here, and so its flawed analysis warrants further discussion.  Defendant-O'Keefe was

11  the captain of a tugboat that capsized, resulting in the death of a passenger he had

12  illegally invited onboard.  *O'Keefe*, 426 F.3d at 276.  O'Keefe was convicted of

13  seaman's manslaughter after the trial evidence showed he was under the influence of

14  cocaine at the time of the accident.  *Id.*  On appeal, O'Keefe argued that the district

15  court erred by refusing to instruct the jury that § 1115 included a gross negligence

16  element.  *Id.* at 277-79.  Because the issue was raised on appeal as a challenge to the

17  jury instructions, the Fifth Circuit reviewed for an abuse of discretion, and it affirmed

18  the conviction under that deferential standard.  *Id.*

19       In reaching this decision, *O'Keefe* provided three related reasons; (1) that the

20  plain terms of § 1115 are "unambiguous and therefore must be given their plain

21  meaning," namely that the statute criminalizes simple negligence, *id.* at 279; (2) the

22  court rejected "O'Keefe's contention that Congress is presumed to have incorporated

23  common law meanings of negligence" that the courts have applied to the more general

24  manslaughter statute, § 1112, *id.* at 278 n.1; and (3) that "early cases" interpreting

25  § 1115 in the 19th century and early 20th century "strongly suggest[] that Congress did

26  not intend a requirement" of gross negligence, *id.* at 278.  *O'Keefe*'s analysis

27

28

12

contravenes binding precedent in this Circuit and so should not bear on this Court's analysis.

First, as to the plain text of § 1115, consistent precedent dictates that "negligence" in a criminal statute refers specifically to gross negligence. The Supreme Court has instructed that in interpreting a criminal statute, the Court "must construe the statute in light of the background rules of the common law[.]" *Staples v. United States*, 511 U.S. 600, 605 (1994). "And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U.S. 246, 263 (1952).

Thus, in interpreting the plain text of § 1115—"misconduct, negligence, or inattention to his duties"—the Court "must construe the statute in light of the background rules of the common law." *Staples*, 511 U.S. at 605. And those background rules dictate that the definition of "negligence" in a criminal statute—and especially in a homicide statute—is "gross negligence." Indeed, Black's Law Dictionary defines "criminal negligence" as "Gross negligence so extreme that it is punishable as a crime." *Negligence*, Black's Law Dictionary (11th ed. 2019). The commentary to the definition also notes that "legislatures and the courts have often made it clear that criminal liability generally requires more fault than the ordinary negligence which will do for tort liability." *Id.* Similarly, the Model Penal Code states that when a statute criminalizes conduct performed "negligently," it requires proof of gross negligence. Model Penal Code § 2.02(2)(d)[25]; *see also* Herbert Wechsler,

---

[25] Model Penal Code § 2.02(2)(d) provides:

   **Negligently.** A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his

*Codification of Criminal Law in the United States: The Model Penal Code*, 68 Colum. L. Rev. 1425, 1438 (1968) (explaining that under the Model Penal Code, criminal negligence requires a showing of gross negligence, and "[m]uch more than the 'ordinary negligence' of tort law is thus deemed to be involved.").[26]

Moreover, as addressed above, the Ninth Circuit has repeatedly stated that "negligence" in a homicide statute means "gross negligence." *Pardee*, 368 F.2d at 374 (holding that "a charge of manslaughter by negligence is not made out by proof of ordinary simple negligence that would constitute civil liability," and "the amount or degree or character of the negligence to be proven in a criminal case is gross negligence" (citation omitted)); *Keith*, 605 F.2d at 463-64 (adopting *Pardee* as law of Ninth Circuit); *Barbeau*, 193 F.2d at 948-49 (addressing a "negligent homicide" statute criminalizing "culpable negligence" and agreeing with the district court that a conviction required gross negligence and that "[c]ulpable negligence is something more than the slight negligence necessary to support a civil action for damages").

Given this extensive authority, when Congress uses the term "negligence" to define liability in § 1115, it "presumably knows and adopts the cluster of ideas that were attached" to that "term of art" in the context of American criminal law. *Morissette*, 342 U.S. at 263. That cluster of ideas consistently states that criminal

---

conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

[26] The exception that proves the rule here is that "negligence" in so-called "regulatory" or "public welfare" statutes can sometimes be read to criminalize simple negligence, but only in "limited circumstances" and only when the statute imposes only "small penalties." *Staples*, 511 U.S. at 606–07 (explaining that in interpreting "public welfare offenses," the Court will dispense with the typical interpretive rules governing criminal statutes' mens rea, but only in "limited circumstances" and usually only when the statutes impose only "small penalties"); *see also United States v. Hanousek*, 176 F.3d 1116, 1121-22 (9th Cir.1999) (Clean Water Act is public welfare legislation that criminalizes simple negligence because its criminal provisions are "clearly designed to protect the public at large from the potentially dire consequences of water pollution").

negligence *is* gross negligence, especially in a homicide statute.  *O'Keefe* subverts these foundational principles of statutory interpretation in concluding that the plain terms of § 1115 criminalize simple negligence.

Second, the language of § 1115—criminalizing "misconduct, negligence, or inattention to his duties"—does not indicate a lower standard of care than the text of § 1112, which criminalizes conduct done "without due caution and circumspection." Section 1112 never mentions "negligence" at all, let alone gross negligence.  Thus, as the district court stated in *Hilger*, to the extent neither statute explicitly requires gross negligence, the same caselaw reading that element into § 1112 should apply equally to § 1115.  (Ex. A at 6-7, 14-15.)

In a footnote, *O'Keefe* briefly dismisses any comparisons to § 1112 because "Section 1112 and § 1115 are separate crimes addressing different concerns with different penalties."  *O'Keefe*, 426 F.3d at 279 n.1.  This misses the point.  The consistent decisions—*Garcia*, *Crowe*, *Shortman, Keith,* and *Pardee*—reading a gross negligence element into the crime of manslaughter are not based on § 1112 specifically; they instead emerge from the "the fundamentals of involuntary manslaughter," *Pardee*, 368 F.2d at 374.  Moreover, this line of precedent is not limited to § 1112; in *Barbeau*, the Ninth Circuit stated that an Alaska statute titled "negligent homicide"—whose plain text applied only to "culpable negligence"—also requires proof of gross negligence. *Barbeau*, 193 F.2d at 948.  These holdings apply across different statutes based on the fundamental principle that negligent homicide requires a greater degree of culpability than the ordinary negligence sufficient to sustain a civil tort claim.  *See id.* ("Culpable negligence is something more than the slight negligence necessary to support a civil action for damages." (quoting district court)); *Pardee*, 368 F.2d at 374.  This fundamental principle must apply equally to § 1115.  (*See* Ex. A at 6-7, 14-15.)

Moreover, since O'Keefe was decided, the Supreme Court has repeatedly stated that there is a presumption against imposing any criminal liability—let alone homicide

liability—based on simple negligence; as the Supreme Court recently explained, "we have long been reluctant to infer that a negligence standard was intended in criminal statutes." *Elonis v. United States*, 575 U.S. 723, 738 (2015) (quotation marks and citation omitted); *see also Ruan v. United States*, --- S. Ct. ---, No. 20-1410, 2022 WL 2295024, at *8 (U.S. June 27, 2022) (repeating the same).  There is no basis to overcome that presumption in the case of the seaman's manslaughter charge, especially considering the long line of cases stating that negligence in the context of a homicide statute must especially be interpreted to mean gross negligence.

Finally, as to the five "early cases" *O'Keefe* relied on, none are from this Circuit, nor do those cases "strongly suggest" that § 1115 criminalizes simple negligence. *Contra O'Keefe*, 426 F.3d at 278.  The early cases are instead equivocal on the issue presented here and should not control the analysis.  The first early case is *United States v. Warner*, 28 F. Cas. 404 (D. Ohio 1848), which reached the uncontroversial conclusion that seaman's manslaughter is a rare criminal statute that does not require proof of "malicious intent."  *Id.* at 407.  Notably, *Warner* explained that Congress passed the statute because "within a short period anterior to the date of this statute, numerous steamboat disasters had occurred in our country, attended with a melancholy loss of human life, under circumstances justifying the conclusion that there was *gross negligence*, yet without the possibility of proving, either positively or inferentially, a malicious intent."  *Id.* at 408 (emphasis added).  *Warner* thus contributes to the conclusion that the statute is meant to apply only to grossly negligent conduct.

On the other hand, in a pair of cases from New York, the trial courts instructed the juries that seaman's manslaughter can arise from any "degree of misconduct, whether it be slight or gross." *United States v. Farnham*, 25 F. Cas. 1042, 1044 (S.D.N.Y. 1853); *United States v. Collyer*, 25 F. Cas. 554, 578 (S.D.N.Y. 1855) (quoting *Farnham*).  However, in both cases, these were passing remarks during lengthy instructions that focused on the fact that a conviction did not require proof of

malicious intent.  Moreover, there is no indication that the defendants objected to these instructions about the degree of misconduct required.  These passing references should thus not decide the issue.

The final two "early cases" merely emphasize that intentional misconduct is not an element of the offense; they in no way address the degree of negligence required. *See United States v. Keller*, 19 F. 633, 639 (D. W. Va. 1884) (instructing jury that seaman's manslaughter does not require proof of intentional misconduct and detailing various dangerous conduct that could be criminally liable); *Van Schaick v. United States*, 159 F. 847, 850 (2d Cir. 1908) (reciting statutory elements and concluding that "Intent is not an element of the offense, malice need not be proved").

Given that the "early cases" relied on by *O'Keefe* are equivocal or irrelevant to the issue presented here, they should not distract from the fact that consistent, binding precedent dictates that a manslaughter or negligent homicide statute requires proof of gross negligence.

\*\*\*\*\*

The seaman's manslaughter statute thus includes an element requiring proof of gross negligence.  And because the indictment fails "to detail each element of the charged offense," it must be dismissed.  *Keith*, 605 F.2d at 463–65 (dismissing manslaughter indictment for failing to allege gross negligence, even though the indictment tracked the language of the statute).[27]

---

[27] *Keith* explained that the gross negligence requirement actually encompasses two elements, each of which must be alleged in an indictment charging manslaughter. Specifically, the indictment must allege: "(1) that the defendant acted with 'gross negligence,' defined as 'wanton or reckless disregard for human life;' and (2) that the defendant had actual knowledge that his conduct was a threat to the lives of others . . . or had knowledge of such circumstances as could reasonably be said to have made foreseeable to him the peril to which his acts might subject others."  *Keith*, 605 F.2d at 463; *see also Garcia*, 729 F.3d at 1175.  The second element—the knowledge of risk—flows from the fact that "awareness of the tendency to danger, or the foreseeability of injury. . . is an indispensable element of negligence."  *United States v. Escamilla*, 467 F.2d 341, 346 (4th Cir. 1972); *see also Keith*, 605 F.2d at 463 (citing *Escamilla*).

17

1

## IV.  CONCLUSION

2    For the foregoing reasons, the indictment should be dismissed without prejudice

3  for failing to allege each element of the charged offense.

4

5                                     Respectfully submitted,

6                                     CUAUHTEMOC ORTEGA

7                                     Federal Public Defender

8

9  DATED:  June 30, 2022          By  /s/ Georgina Wakefield

10                                    GEORGINA WAKEFIELD

11                                    GABRIELA RIVERA
                                      JULIA DEIXLER
12                                    Deputy Federal Public Defenders
                                      Attorney for JERRY NEHL BOYLAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18