STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Chief, Environmental and Community Safety Crimes Section
JOSEPH O. JOHNS (Cal. Bar No. 144524)
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorneys
Environmental and Community Safety Crimes Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8644
    Facsimile: (213) 894-0141
    E-mail:   Matthew.O'Brien@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-600-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR FAILURE TO ALLEGE GROSS NEGLIGENCE |
| v. | |
| JERRY NEHL BOYLAN, | Hearing Date: August 18, 2022 |
| Defendant. | Hearing Time: 8:00 a.m. Location:   Courtroom of the Hon. George H. Wu |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Mark A. Williams, Joseph O. Johns, and Matthew W. O'Brien, hereby files its Opposition to defendant JERRY NEHL BOYLAN's Motion to Dismiss Indictment for Failure to Allege Gross Negligence (Dkt. No. 42).

//

//

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated:  July 21, 2022            Respectfully submitted,

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
JOSEPH O. JOHNS
MARK A. WILLIAMS
MATTHEW W. O'BRIEN
Assistant United States Attorneys
Environmental and Community Safety
Crimes Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

**Contents**

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS............................................2

      A.    The *Conception* and Its Crew..........................2

      B.    The *Conception's* Final Trip..........................3

      C.    The Fire...............................................5

III.  ARGUMENT.....................................................9

      A.    The Plain Language Of 18 U.S.C. § 1115 Establishes
            That Only Proof Of Misconduct, Negligence, Or
            Inattention To Duties Is Required......................9

      B.    The History Of 18 U.S.C. § 1115 Supports The Plain
            Meaning Of Negligence In The Text.....................12

      C.    Other Circuits Have Determined That Section 1115
            Requires Ordinary Negligence..........................13

      D.    Defendant's Efforts To Distinguish O'Keefe Are Not
            Persuasive............................................17

            1.    The "early cases" strongly support a finding that
                  ordinary negligence standards apply to Section
                  1115............................................17

            2.    Mens rea standards from Section 1112 do not apply
                  to Section 1115.................................21

IV.   CONCLUSION..................................................24

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**Federal Cases**

Barbeau v. United States,
  193 F.2d 945 (9th Cir. 1951) .................................. 19

Deal v. United States,
  508 U.S. 129 (1993) ......................................... 11

Elonis v. United States,
  575 U.S. 723 (2015) ......................................... 23

In re Charge to Grand Jury,
  30 F. Cas. 990 (E.D. La. 1846) .............................. 12

Morissette v. United States,
  342 U.S. 246 (1952) ......................................... 21

Robinson v. Shell Oil Co.,
  519 U.S. 337 (1997) ......................................... 11

Staples v. United States,
  511 U.S. 600 (1994) ......................................... 23

United States v. Alexander,
  471 F.2d 923, FN 54 (1972) .................................. 21

United States v. Alvarez,
  809 Fed. Appx. 562 (11th Cir. 2020) ..................... 15, 23

United States v. Browner,
  889 F.2d 549 (5th Cir. 1989) ................................ 19

United States v. Collyer,
  25 F. Cas. at 577-78 (S.D.N.Y. 1855) ....................17, 18

United States v. Crowe,
  563 F.3d 969 (9th Cir. 2009) ................................ 19

United States v. Farnham,
  25 F.Cas. 1042, 1044 (S.D. New York, 1853) .............17, 18

United States v. Fesler,

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

  781 F.2d 384 (5th Cir. 1986) ................................. 19

United States v. Garcia,

  729 F.3d 1171 (9th Cir. 2013) ................................ 19

United States v. Hilger,

  No. CR 87-803-JPV, ECF No. 50 (N.D. Cal. March 10, 1988) ....... 16

United States v. Holmes,

  104 F. 884 (C.C. Ohio 1900). ............................. 12, 22

United States v. Kaluza,

  780 F.3d 647 (5th Cir. 2015) ................................. 14

United States v. Keith,

  605 F.2d 462–65 (9th Cir. 1979) .............................. 19

United States v. Keller,

  19 F. 633 (1884) ............................................. 20

United States v. Lopez,

  998 F.3d 431 (9th Cir. 2021) ................................. 10

United States v. O'Keefe,

  426 F.3d 274 (5th Cir. 2005) ...................... 13, 14, 19

United States v. Pardee,

  368 F.2d 368 (4th Cir. 1966) ................................. 19

United States v. Ruan,

  142 S.Ct. 2370 (2022) ........................................ 23

United States v. Shortman,

  91 F.3d 80 (9th Cir. 1996) ................................... 19

United States v. Thurston,

  362 F.3d 1319–22 (11th Cir. 2004) ........................... 16

United States v. Thurston,

  No. 2:02-cr-121-29, ECF No. 65 (M.D. Fla. June 10, 2003) ....... 16

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

United States v. Warner,

  28 F.Cas. 404, 407 (D.Ohio, 1848) ................................ 19

United States v. W.R. Grace,

  429 F.Supp.2d 1207, 1226 (9th Cir. 2006) ........................ 10

Van Schaick v. United States,

  159 F. 847 (1908) ........................................ 15, 20

Yates v. United States,

  574 U.S. 528 (2015) .......................................... 11

**Federal Statutes**

18 U.S.C. § 875(c)............................................... 23

18 U.S.C. § 1112 ............................................ *passim*

18 U.S.C. § 1115 ............................................ *passim*

21 U.S.C. § 841 ................................................ 24

**Other**

40 Cong. Rec. S1190(Jan. 28, 1908)................................ 21

iv

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     INTRODUCTION**

3      This was a preventable tragedy.  But for defendant JERRY NEHL

4 BOYLAN's ("defendant") misconduct, negligence, and inattention to his

5 duties – including failing to post the "roving patrol" or night watch

6 required by the Conception's operating license and federal law, and

7 failing to train his crew to respond to emergencies, as also required

8 by federal law – the *Conception's* 33 passengers and youngest

9 crewmember likely would still be alive.

10      The government charged defendant with violating 18 U.S.C.

11 § 1115, a statute that expressly requires only simple negligence (or

12 misconduct, or inattention to duties) for criminal liability.

13 Nonetheless, defendant moves to dismiss the Indictment for failure to

14 allege gross negligence.  Because Section 1115 requires only simple

15 negligence, the Motion relies almost entirely on cases involving the

16 general manslaughter statute (18 U.S.C. § 1112), a different statute

17 prohibiting different conduct.  The precedents requiring gross

18 negligence under Section 1112 are not relevant to a Section 1115

19 prosecution.

20      Every appellate court to have addressed defendant's argument has

21 rejected it, reasoning that Section 1115 means what it says:  simple

22 negligence is sufficient for a criminal conviction under Section

23 1115.  This Court should follow these precedents and deny the Motion

24 in its entirety.

25

26

27

28

1  **II.   STATEMENT OF FACTS[1]**

2       **A.    The *Conception* and Its Crew**

3       The *Conception* was a 79-foot long, wood and fiberglass dive boat

4  with three decks -- an upper deck with a wheelhouse, crew sleeping

5  quarters, and sun deck; a main deck with a galley, salon, bathroom,

6  shower, and open rear sun deck; and a lower deck where the passenger

7  bunkroom was located.[2]

8       The *Conception's* Certificate of Inspection, which was posted in

9  the boat's wheelhouse where defendant worked each day and which

10 defendant was required to comply with, stated:

11       A MEMBER OF THE VESSEL'S CREW SHALL BE DESIGNATED BY THE
         MASTER AS A ROVING PATROL AT ALL TIMES, WHETHER OR NOT THE
12       VESSEL IS UNDERWAY, WHEN THE PASSENGER'S BUNKS ARE
         OCCUPIED.
13

14       Although defendant had years of experience as a master (the

15 equivalent of a vessel's captain), most of the *Conception's* crew was

16 inexperienced and untrained with respect to emergency procedures.

17 Crewmember 1 had been employed by Truth Aquatics, the *Conception's*

18 owner, since June or July 2019 and had just received his master's

19 license a few months before that.[3]  Crewmember 2 had been employed by

20 Truth Aquatics since November 2018, but only began working

21 consistently aboard the *Conception* in May 2019 when the peak season

22 began.  He did not hold any licenses, and his prior maritime

23 experience was a part-time "customer oriented" job doing short trips

24 _____

25      [1] This statement of facts is provided to correct and supplement
   defendant's "background" statement of facts.

26      [2] ATF Origin and Cause Report, bates nos. 62503-62512.

27      [3] Interview transcript, bates no. 288900.  In the event the
   Court wishes to examine the complete statements made by each
28 surviving crewmember, transcripts of the recorded interviews can be
   lodged with the Court under seal.

aboard a sailboat in Northern California.[4]  Crewmember 3 was a chef who was hired by Truth Aquatics three weeks before the *Conception* fire.  This was his fifth or sixth trip aboard the *Conception*.  He did not have any other experience working or cooking aboard boats.[5]  Crewmember 4 had been working aboard the *Conception* for two years, but had no prior boating experience before that.  Before working for Truth Aquatics, he had lived in Hawaii for 32 years where he worked odd jobs.[6]  Deckhand Alexandra Kurtz was newly hired and had only worked as a deckhand aboard the *Conception* on one prior trip.[7]

No crewmember had received any fire suppression or firefighting training from defendant.  Although defendant may have pointed out the firehoses and pumps onboard the *Conception*, he never had crewmembers actually practice activating the fire pumps, unravelling the two fire hoses, or conducting any fire drills.[8]  When asked by investigators about fire hoses onboard the *Conception* after the catastrophic shipboard fire, described below, one crewmember replied, "I don't think there is a fire hose...I'm not even aware of that, yeah."[9]

**B.   The *Conception's* Final Trip**

At around 4:00 a.m. on August 30, 2019, the *Conception* departed Santa Barbara Harbor for a drive trip to the Channel Islands.  Defendant, his crew, and 33 passengers were onboard.  The passengers and crew slept while defendant piloted the vessel to the first dive site.  At the dive site, before the first dive of the trip, the crew

---

[4] Interview transcript, bates nos. 92322-92330.

[5] Interview transcript, bates nos. 57900-57901.

[6] Interview transcript, bates nos. 91859-91861.

[7] Interview transcript, bates no. 92332.

[8] Interview transcript, bates nos. 92373-92374; 289018; 57968.

[9] Interview transcript, bates no. 91922-91923.

conducted a "safety briefing" for the passengers.  Defendant announced the briefing over the *Conception's* PA speaker system, and the passengers gathered in the galley area to listen.[10]

For this trip, defendant asked Crewmember 2 to handle the briefing.  (Crewmember 1 had never conducted a safety briefing.)[11] Crewmember 2 discussed the bullet points on the safety briefing paper, which focused largely on dive safety.  Although the escape hatch from the passenger bunk area on the lower deck of the boat is not included on the safety briefing paper, Crewmember 2 indicated that he probably told the passengers about it.[12]  After his speech concluded, the passengers began diving.

The Labor Day weekend dive trip proceeded uneventfully.  After a night dive on September 1, 2019, the passengers ate dinner and defendant moved the *Conception* from Cueva Valdez to Platt's Harbor near Santa Cruz Island.[13]  The crew and passengers then went to sleep at different times – defendant and Crewmembers 1, 2, 3, and 4 upstairs on the upper deck; Ms. Kurtz and the 33 passengers in the lower deck in the bunkroom.  Defendant was heard snoring in his bunk at around 11:45 p.m. that evening.[14]

Consistent with his usual practice, defendant did not have a night watch or roving patrol that evening.[15]  In fact, despite the fact that defendant was aware of a fire in October 2018 aboard the

---

[10] Interview transcript, bates no. 92337.

[11] Interview transcript, bates no. 92338.

[12] Interview transcript, bates no. 92339.

[13] Interview transcript, bates no. 288943.

[14] Interview transcript, bates no. 92348.

[15] Interview transcript, bates nos. 91924; 92373; 288942; 57968.

*Conception's* sister ship,[16] defendant had never provided any training whatsoever on night watches or roving patrols.[17]  Most crewmembers had never heard those terms prior to being questioned during the criminal investigation.[18]

### C.    The Fire

A fire began on the *Conception* in the early morning hours of September 2, 2019.  The first person to notice the fire was Crewmember 4.  He indicated that he had gone to sleep around 9:30 or 10:30 p.m., but awoke around 1:30 a.m. and went down to clean up the galley.[19]  Crewmember 4 had trouble sleeping and would sometimes get up to work at night, so it was not unusual for him to be working in the galley late at night or early in the morning.  He cleaned up and then went to bed at around 2:35 a.m.  No other crewmembers or passengers were awake when he went to bed.[20]

Crewmember 4 woke up again shortly after he went to bed when he heard what he thought was a chair being moved and someone yell out "uh" or "ow" like they might have sprained their ankle.[21]  He waited a few minutes and then got up to see what happened.  When he exited his bunk near the wheelhouse and walked toward the stern, he looked down the stairs from the back of the top deck and saw a fire on the

---

[16] A former captain of the *Vision*, the *Conception's* sister ship, specifically told defendant about a battery fire aboard the *Vision* in October 2018.  Report of interview, bates no. 52998.

[17] Interview transcript, bates nos. 57968; 91924; 92370.

[18] Interview transcript, bates nos. 92370; 91924; 57967.

[19] Interview transcript, bates no. 91882.

[20] Interview transcript, bates no. 91888.

[21] Interview transcript, bates nos. 91889-91990.

starboard side.  He said that the rest of the crew were sleeping, and he yelled "fire!" to wake them up.[22]

It was a chaotic scene after the crew awoke.  Defendant and Crewmembers 1, 2, 3, and 4 ran around the upper deck, and at some point, defendant told Crewmember 3 to get the fire extinguisher in the wheelhouse.  Crewmember 3 was unable to open the cabinet where the fire extinguisher was located.[23]  The crew was in the wheelhouse when defendant yelled "abandon ship" or "everybody out."[24] Crewmembers 2 and 4 jumped down to the main deck, and Crewmember 1 lowered himself down to the main deck from the upper deck's wing station.[25]  Crewmember 3 jumped down to the main deck on the port side, breaking his leg as a result of the impact.

After he jumped down to the main deck, Crewmember 4 went aft (back) on the main deck to try to get a fire extinguisher from the galley, but he could not enter due to the fire.[26]  He then went toward the bow of the *Conception*.[27]  In going back and forth down the port side Crewmember 4 passed the port side fire hose at least twice.  He had never been told and did not know that the fire hose was there, much less how to use it.[28]

When Crewmember 1 got down to the main deck he opened the port side passenger gate (a break in the railing around the vessel's deck) to give passengers a way off of the vessel if they were able to get

---

[22] Interview transcript, bates no. 91891-91892.

[23] Interview transcript, bates nos. 57941-57943.

[24] Interview transcript, bates no. 57943.

[25] Interview transcript, bates nos. 92356-92357; 288964.

[26] Interview transcript, bates no. 91892.

[27] Interview transcript, bates no. 91900.

[28] Interview transcript, bates nos. 91923.

out.[29]  Crewmembers 1, 2, and 4 also tried to pull open one of the front windows to the galley that was slightly ajar, but they could not open it because the window latch was still attached.[30]

Defendant stayed in the wheelhouse momentarily and at 3:14 a.m. placed two distress calls to the Coast Guard on Channel 16. Defendant was the first to jump in the water; he did not lower himself onto the main deck, but instead jumped directly from the wheelhouse.[31]  There is no evidence that defendant ever attempted to grab the fire ax or fire extinguisher in the wheelhouse or otherwise attempt to fight the fire before abandoning ship.  Nor did defendant use the *Conception's* PA system to alert the passengers about the fire.  To the contrary, just as one crewmember was going to call out to defendant for the fire ax (to break one of the front windows to the galley, thus opening a possible escape route near the stairway into the bunk area), defendant jumped out of the wheelhouse directly into the water.[32]

After seeing defendant abandon ship, Crewmember 1 also jumped into the water.[33]  Defendant was then heard yelling for the crew to "jump off," "get in the water," and "get away from it."[34]  The remaining crewmembers jumped into the water as well.

Crewmembers 3 and 4 swam away from the *Conception*, and defendant, Crewmember 1, and Crewmember 2 swam toward the *Conception's* aft deck and the skiff (small lifeboat) that was

---

[29] Interview transcript, bates no. 288966.

[30] Interview transcript, bates no. 288967-288968.

[31] Interview transcript, bates no. 91902.

[32] Interview transcript, bates no. 92359.

[33] Interview transcript, bates no. 288968.

[34] Interview transcript, bates no. 92359.

attached.  Crewmember 1 got on deck and attempted to get into the
engine room to activate a fire pump (which, due to a lack of
training, he did not realize could have been activated from the port
and starboard side fire hose stations on the main deck, given that
the vessel's electrical system was still working and energizing all
water pumps).[35]  He could not enter the engine room due to the smoke,
so he started to lower the small skiff using the electronic winch.
Crewmember 2 arrived while the skiff was being lowered, and as
defendant was swimming to the skiff he was yelling for the crew to
"lower the skiff we need to get away."[36]

Crewmembers 1 and 2 lowered the skiff and helped pull defendant
onboard.[37]  Crewmember 2 cut the bow line that attached the skiff to
the *Conception*, and Crewmember 1 worked on the stern line.
Crewmember 2 then went back on the *Conception's* aft deck to attempt
to rescue people, but defendant told him not to go toward the fire.
Crewmember 2 asked how he could get into the bunkroom to help the
passengers.  Defendant told him that "we can't save them."[38]

With defendant onboard, Crewmembers 1 and 2 attempted to pilot
the skiff away from the *Conception* but the rope got stuck in the
skiff's propeller.  They had to clear the tangled rope from the
propeller each time before motoring away to pick up Crewmembers 3 and
4.  Once they were all onboard, they piloted the skiff toward the
*Grape Escape*, a nearby sailboat.[39]

---

[35] Interview transcript, bates no. 288969.

[36] Interview transcript, bates no. 92362.

[37] Interview transcript, bates nos. 288974; 92362.

[38] Interview transcript, bates nos. 92363-92364.

[39] Interview transcript, bates no. 92364.

The crew banged on the *Grape Escape's* hull to wake the occupants and eventually got onboard.  The next radio call from defendant to the Coast Guard was from the *Grape Escape*.  While defendant and Crewmembers 3 and 4 stayed aboard the *Grape Escape*, Crewmembers 1 and 2 took the skiff back toward the *Conception* to look for survivors.  They found none.[40]

First responders eventually made it to the *Conception* where they attempted to fight the fire and picked up the crew.  The *Conception* sank as a result of the fire.  Extensive dive and salvage operations were performed by several agencies in order to recover the *Conception*, the victims' remains, and the other materials that had been on the vessel.

## III. ARGUMENT

### A. The Plain Language Of 18 U.S.C. § 1115 Establishes That Only Proof Of Misconduct, Negligence, Or Inattention To Duties Is Required

Section 1115 provides that any captain "by whose misconduct, negligence, or inattention to his duties on [a] vessel the life of any person is destroyed" shall be fined, imprisoned, or both.  18 U.S.C. § 1115.  There is no ambiguity.  The plain text of the portion of the statute that defendant is charged with criminalizes simple negligence, misconduct, or inattention to duties that results in the loss of life.

The issue raised by defendant's Motion is one of statutory construction.  The rules of statutory construction are well-established and begin with the actual text of the statute in question "and end there if the statute's language is plain."  <u>United States v.</u>

---

[40] Interview transcript, bates no. 92365-92367.

1   Lopez, 998 F.3d 431, 435 (9th Cir. 2021) (citing Bostock v. Clayton
2   Cnty., 140 S.Ct. 1731, 1749 (2020)). "Unless defined in the statute,
3   a statutory term receives its 'ordinary, contemporary, common
4   meaning.'" Id. (quoting Perrin v. United States, 444 U.S. 37, 42
5   (1979)). "A court should seek to 'give effect to the plain, common-
6   sense meaning of the enactment without resorting to an interpretation
7   that defies common sense.'" United States v. W.R. Grace, 429
8   F.Supp.2d 1207, 1226 (9th Cir. 2006) (quoting United States v.
9   Weitzenhoff, 35 F.3d 1275, 1283 (9th Cir. 1994)).

10       Section 1115 provides a broad range of conduct – misconduct,
11   negligence, and inattention to duty – as the basis for criminal
12   liability.  If, as a result of inattention, a captain fails to
13   perform one of his duties, and that failure results in loss of life,
14   he is criminally liable.  If a captain commits a negligent act, which
15   results in loss of life, he is also criminally liable under the
16   statute.  Accordingly, given the statute's low bar for criminal
17   liability, there is no legal basis to raise that bar by requiring
18   gross negligence.

19       Defendant's suggestion that this Court modify the word
20   "negligence" with the adjective "gross," by an importation of federal
21   common principles applicable only to the admittedly-ambiguous general
22   manslaughter statute (18 U.S.C. § 1112), results in a situation that
23   defies common sense because "gross" does not apply to inattention to
24   duties or misconduct.  Those terms are associated with ordinary
25   negligence, not the heightened standard of gross negligence.  As
26   described further below, the legislative history of Section 1115
27   shows that Congress meant precisely what it said in 1838 when it
28   enacted the predecessor to the statute.  Congress' use of the two

1   "bookend" terms "misconduct" and "inattention to duties" as further

2   descriptions of the mens rea required for conviction indicates that

3   it intended that negligence be given a similar meaning as the

4   surrounding terms.  "Gross inattention to duties" and "gross

5   misconduct" are not required under Section 1115 (and not court has

6   ever found otherwise), so to suggest that this Court modify only one

7   of three terms with the adjective "gross" defies logic.

8       Courts should reject statutory construction arguments "that

9   would render another statutory provision surplusage or a nullity."

10  Id. (citation omitted).  Both misconduct and inattention to one's

11  duties are analogous to negligence.  See Yates v. United States, 574

12  U.S. 528 (2015) ("[o]rdinarily, a word's usage accords with its

13  dictionary definition"); see also Robinson v. Shell Oil Co., 519 U.S.

14  337, 341 (1997) ("[t]he plainness or ambiguity of statutory language

15  is determined [not only] by reference to the language itself, [but as

16  well by] the specific context in which that language is used, and the

17  broader context of the statute as a whole"); see also Deal v. United

18  States, 508 U.S. 129, 132 (1993) (it is a "fundamental principle of

19  statutory construction (and, indeed, of language itself) that the

20  meaning of a word cannot be determined in isolation, but must be

21  drawn from the context in which it is used").

22      Defendant's request to dismiss the Indictment for failure to

23  allege "gross negligence" not only ignores the plain text of the

24  statute, but it also renders the statute's additional descriptions of

25  scienter surplusage or a nullity.  Their inclusion in the plain text

26  of the predecessor to Section 1115 in 1838 prove that Congress meant

27  simple negligence when it used the term "negligence" as one of three,

28  similar scienter descriptions in the statute.

**B.    The History Of 18 U.S.C. § 1115 Supports The Plain Meaning Of Negligence In The Text**

Section 1115 was enacted by Congress as an Act "to provide the better security of the lives of passengers on board of vessels propelled in whole or in part by steam."  Act of July 7, 1838, 5 Stat. 304.  The statute was enacted because horrific accidents were occurring with the expansion of steamboat travel on the nation's waterways.  United States v. Holmes, 104 F. 884, 995 (C.C. Ohio 1900).  The goal of the new law was to prevent these catastrophes by demanding the utmost vigilance from the crew and imposing criminal liability for fatal lapses.[41]

Less than eight years after the passage of the Act, a federal judge presiding over a grand jury convened in the Eastern District of Louisiana to investigate alleged violations of the statute explained the purpose of the law and the level of culpability required:

> That statute virtually says to the officers of steamboats who assume the solemn responsibility of transporting persons and property from one port to another: You shall attend strictly to the duty which you have, for a valuable consideration, assumed to perform.  You shall observe abundant caution; you shall take all proper care that no disaster occurs which may result in the loss of life.

In re Charge to Grand Jury, 30 F. Cas. 990 (E.D. La. 1846).  The judge instructed the grand jury that the statute required that the vessel's crew members "attend strictly to duty" and that they

---

[41] The other sections of the Act dealt with strict licensure, inspections, strict safety procedures, and equipment requirements, among other things. Act of July 7, 1838, 5 Stat. 304, i.e.  These served to create public safety standards, and as such logically and arguably establish the grounds for misconduct, negligence, and breaches of, or inattention to, duties for violating the new public welfare offense.

12

"observe abundant caution" in light of the destruction and harm that can result from a mistake.

Defendant has provided no legal support for the assertion that 18 U.S.C. § 1115 and its predecessor Act are derived from federal common law principles concerning voluntary and involuntary homicide (manslaughter).  They are not.  In fact, they are early examples of Congress enacting a public welfare statute to express the public's will to address catastrophes.  As such, common law principles of gross negligence do not apply to Section 1115.

### C.   Other Circuits Have Determined That Section 1115 Requires Ordinary Negligence

Although this is an issue of first impression for the Ninth Circuit, two Circuit Courts of Appeal have squarely addressed and defined "negligence" in Section 1115.  Those courts found that "negligence" means ordinary negligence.

In United States v. O'Keefe, 426 F.3d 274 (5th Cir. 2005), defendant O'Keefe was the captain of a tugboat that was operating on the Mississippi River at the time of an accident which caused the vessel to capsize.  As a result of the accident, O'Keefe's wife drowned.  The government introduced evidence that his wife was not authorized to be on the tugboat and that O'Keefe was operating the vessel while under the influence of a narcotic.  Id. at 276.  During his trial, O'Keefe requested that the district court instruct the jury that "the Government had to prove gross negligence or heat of passion,[42] as is required for a conviction of common law manslaughter" under Section 1112.  Id. at 277.  The district court disagreed and

---

[42] "Heat of passion" is lifted from 18 U.S.C. § 1112, and thus, further underscores the differences between Sections 1112 and 1115.

instructed the jury that "[t]he term 'negligence' is defined as a breach of duty.  A breach of a duty is defined as an omission to perform some duty, or it is a violation of some rule or standard of care, which is made to govern and control one in the discharge of some duty." Id. at 278.

On appeal, the Fifth Circuit noted that the district court cited five cases "strongly suggesting that Congress did not intend a requirement of the heightened mens rea that O'Keefe seeks." Id. at 278.  The court also stated that "when the plain meaning of the statute is clear on its face, courts are required to give effect to the language of the statute according to its term." Id. at 279.  In rejecting O'Keefe's arguments that the mens rea standard from Section 1112 should apply to Section 1115, the Fifth Circuit concluded:

> After evaluating § 1115, we hold that its terms are unambiguous and therefore must be given their plain meaning.  As such, we find nothing in the statute's terms suggesting that the words "misconduct, negligence or inattention," were ever meant to imply gross negligence or heat of passion.

Id.

In 2015, the Fifth Circuit again addressed the mens rea required for a conviction under Section 1115 in an appeal arising from the Deepwater Horizon oil spill in the Gulf of Mexico.  In a statement of dictum unrelated to the direct issues on appeal, the appellate court confirmed its earlier O'Keefe holding by stating:

> Unlike the common law definition of manslaughter and the companion statutory definition for general manslaughter found in Section 1112, Section 1115 only requires the proof of any degree of negligence to meet the culpability threshold.

United States v. Kaluza, 780 F.3d 647, 657 (5th Cir. 2015).

The Eleventh Circuit reached the same conclusion recently in an unpublished opinion. In United States v. Alvarez, 809 Fed.Appx. 562, 564 (11th Cir. 2020), Alvarez was an unlicensed captain of a 91-foot performance yacht that offered performance charters. An individual was killed on one of the charters, and Alvarez was charged with a violation of Section 1115. Id. at 564-66. Alvarez filed a motion to dismiss the indictment, arguing that the statute "unconstitutionally criminalized simple negligence," among other things. The district court denied the motion and Alvarez appealed. Id.

On appeal, the Eleventh Circuit noted that "Alvarez argues that the Constitution requires a heightened mens rea beyond negligence to criminalize conduct. Supreme Court precedent going back nearly a century shows otherwise." Id. at 568. In rejecting Alvarez's argument, the court emphasized that Congress has "affirmatively, unambiguously, and expressly criminalized the act of negligently causing a person's death while operating a vessel" in Section 1115. Id. at 569. Thus, the Eleventh Circuit concluded that "this decision to impose a negligence mens rea fell within Congress's constitutional authority." Id. In a footnote rejecting other statutory construction arguments raised by Alvarez, the court again stated that "[h]ere, as we have explained, Congress spoke plainly and expressly when it included "negligence" in 18 U.S.C. § 1115. So the court has no basis to read in a default mens rea from the common law here." Id., n. 3.

The Second Circuit also addressed the scienter required to prove a Section 1115 violation, though not specifically on the same basis raised by defendant here. Van Schaick v. United States, 159 F. 847, 850-854 (1908) (predecessor to Section 1115 for master's misconduct,

negligence, and neglect of duty requires them to exercise highest degree of skill and care to safeguard human life and prevent disasters; repeated discussion of misconduct, duty, neglect, and duty of ordinary or reasonable care).

Defendant's Motion cites to a 1988 oral decision of a district judge in United States v. Hilger, No. CR 87-803-JPV, ECF No. 50 (N.D. Cal. March 10, 1988), where a Section 1115 charge was dismissed for failure to allege "gross negligence" rather than negligence. See Def. Mot. at 10; and see Det. Mot. Ex. A at 3-9). Based on the limited reasoning contained in the transcript of the motion's hearing, the government submits that the Hilger ruling was incorrectly decided based on the clear reasoning in O'Keefe and its progeny.

Defendant also briefly references another out-of-circuit appellate decision, United States v. Thurston, 362 F.3d 1319, 1321-22 (11th Cir. 2004), in support of his motion. But neither the Eleventh Circuit decision nor the district court's original order dismissing the indictment for failure to allege gross negligence are helpful here. Unlike the district court in Hilger, the record is bare as to the reasons for the district court's sua sponte decision to dismiss the indictment for defects during the defendant's sentencing hearing. See United States v. Thurston, No. 2:02-cr-121-29, ECF No. 65 (M.D. Fla. June 10, 2003) (order dismissing indictment). More importantly, the appellate court ruling in Thurston is irrelevant because it deals only with the denial of the defendant's appeal based on a double jeopardy claim after the government reindicted defendant with a gross negligence allegation. See Thurston, supra, 1321-22.

**D.    Defendant's Efforts To Distinguish <u>O'Keefe</u> Are Not Persuasive**

To counter the highly persuasive authority of the Fifth Circuit's <u>O'Keefe</u> decision and its progeny, defendant makes three claims: (1) that the five "early cases" interpreting Section 1115 referenced by <u>O'Keefe</u> as "strongly" suggesting that the statute criminalizes simple negligence are "equivocal" and not controlling here; (2) that Ninth Circuit precedent regarding scienter in 18 U.S.C. § 1112 manslaughter cases, and the Supreme Court's decisions regarding the background rules of common law, should control; and (3) that the text of Section 1115 does not indicate a lower scienter than the text of Section 1112.  Each of these arguments is incorrect.

1.    <u>The "early cases" strongly support a finding that ordinary negligence standards apply to Section 1115</u>

Regarding defendant's third claim, the government concedes that the five "early cases" are not controlling on this Court's interpretation of the text of Section 1115 because they are all out-of-circuit opinions.  But they are persuasive, and the analyses in those decisions are sound.  Given that they were decided soon after the passage of the original Act, they reflect a far better understanding of what Congress intended and meant when it drafted the predecessor to Section 1115.

Immediately after dismissing these five cases, defendant is forced to acknowledge that in both <u>Farnham</u> and <u>Collyer</u> the juries were instructed that a violation of the predecessor to Section 1115 "can arise from any 'degree of misconduct, whether it be slight or gross.'"  <u>See</u> Def. Motion at 16; <u>see also</u> <u>United States v. Farnham</u>, 25 F. Cas. 1042, 1044 (S.D.N.Y. 1853); <u>United States v. Collyer</u>, 25

17

F. Cas. 554, 578 (S.D.N.Y. 1855) (quoting <u>Farnham</u>).  In fact, the <u>Farnham</u> decision includes the then-common understanding of Section 1115's mens rea in the following jury instruction passages:

> The law does not require the public prosecutor to prove wilful mismanagement or malconduct by the accused. . .
>
> By misconduct, negligence or inattention in the management of steamboats, mentioned in the statute, **is undoubtedly meant** the omission or commission of any act which may naturally lead to the consequences made criminal**; and it is no matter what may be the degree of misconduct, whether it be slight or gross**, if the proof satisfies you that the explosion of the boiler was the necessary or most probable result of it.

<u>Farnham</u>, <u>supra</u>, 25 F. Cas. at 1044 (emphases added).

Further acknowledging the public welfare offense status of Section 1115, and Congress' legislative intent to establish the highest degree of vigilance and care upon the owners and masters of passenger vessels, the judge instructed the <u>Farnham</u> jury as follows:

> You are aware that, as an historical fact, steam had been employed for more than thirty years coastways, and in all the interior waters of the country, and that the use of it was accompanied by many startling disasters, particularly on the Western waters; and the destruction to property and the loss of life so agitated public feeling that congress undertook to enforce regulations in the equipment and navigation of vessels propelled by steam, which might tend to the preservation of life and property exposed to that mode of transportation.  The purpose of congress manifestly was to reach the source from which these evils sprung, and establish rules for their prevention.

<u>Id</u>. at 1043.

The decision in <u>Collyer</u>, which cites to <u>Farnham</u>, is replete with the same charges to the jury defining mens rea as simple misconduct, negligence, or inattention to duties and nothing more.  <u>See</u> <u>Collyer</u>, <u>supra</u>, 25 F. Cas. at 577-78.  In fact, the district court in <u>Collyer</u> even instructed the jury as to the precise type of omission that

Congress intended to address, and thereby constituted misconduct, negligence, or inattention to duty under the statute:

> To make myself understood, gentlemen, the law of congress makes it necessary, or rather makes it the duty of every captain, at every landing place, to blow off steam.  If he does not blow off steam, that is misconduct or negligence, or inattention to his duty.

Id. at 577.

Defendant's Motion dismisses the "early" decision in United States v. Warner, 28 F.Cas. 404 (D. Ohio 1848) with the terse statement that it "reached the uncontroversial conclusion that [Section 1115] is a rare criminal statute that does not require proof of 'malicious intent.'"  Def. Motion at 16.  But the Warner district court had far more to say that is relevant to this Court's analysis some 174 years later, "strongly suggesting that Congress did not intend a requirement of the heightened mens rea" that defendant seeks before this Court.  O'Keefe, supra at 278.  In fact, in charging the jury with his instructions, that court stated as follows:

> **It is declared, in words so plain as to admit of no doubt, that any act of 'misconduct, negligence or inattention,' on the part of any one concerned in steamboat navigation, producing as a result, the loss of life, shall incur the guilt and the penalty of the crime of manslaughter.** If it had been intended that these consequences should follow, in cases only where there was evidence of a positive, malicious intent, the words used would doubtless have been such as to have made that intention clear. And, in that case, the offense defined and punished by the statute, would have been the same as manslaughter, as recognized at common law, and the statutes of all the states of the Union. **But, it is most obvious, from the language of this section, that congress intended to go beyond this, and to provide punishment for acts to which the common law did not affix guilt or annex a penalty.**

Warner, supra, 28 F.Cas. at 407 (emphases added).

Defendant's Motion claims that the final two early cases, United States v. Keller, 19 F. 633 (1884) and Van Schaick, "merely"

19

emphasize that intentional misconduct is not an element of the offense and that they "in no way address the degree of negligence required." This statement is simply not accurate. The <u>Keller</u> district court charged the jury:

> You will observe, under the statute, that **it is not necessary for you to find that the defendant was guilty of willful or intentional misconduct, negligence, or inattention to duty.** It is sufficient if you find that he was guilty of a violation of the statute, in the absence of any intent; and if you so find, then a verdict of guilty should be returned. . .
>
> **In this connection it is proper that I should inform you what constitutes negligence. It has been well defined to be 'a breach of duty.' I think, however, the better definition is that it is an omission to perform some duty, or it is a violation of some rule, which is made to govern and control one in the discharge of some duty. Applying this rule of law, if you should find from the evidence that the accused omitted to perform any duty, or that there was an absence of proper attention, care, or skill, and the performance of his duties as pilot of the Scioto, then you must of necessity find him guilty of negligence**; and that if in consequence of such negligence the life of any person was lost, then you must find him guilty as charged in the indictment.

<u>Id</u>. at 637. The Second Circuit Court of Appeal's decision in <u>Van Schaick</u> echoes the analyses, jury instructions, and holdings of the preceding four, early cases. It is full of references to ordinary neglect and refers to Captain Van Schaick's obligation to exercise "at least ordinary care" with regard to statutory safety regulations vis-à-vis the single count of conviction (the predecessor to Section 1115) and that he "knew, or should have known" of the dangers presented by "oil, paint, junk, straw and other inflammable material there which might be ignited by the carelessness of passengers or crew or by a spark blown from a passing steamer through the open port holes." <u>Van Schaick</u>, <u>supra</u>, 159 F. at 851-52.

20

      2.   <u>Mens rea standards from Section 1112 do not apply to Section 1115</u>

Next, defendant argues that this Court should define the plain text terms of Section 1115, namely, "misconduct, negligence, or inattention to duties," by reference to the ambiguous and confusing scienter definitions set forth in a different statute, Section 1112. This argument lacks merit and flies in the face of more than 170 years of jurisprudence that is bereft of such reasoning.

Section 1115 was revised in 1909 by removing the phrase "shall be deemed guilty of the felony of manslaughter." 40 Cong. Rec. S1190 (Jan. 28, 1908); <u>see</u> <u>also</u> 33 Stat. 1025 (1905). The rest of the statute remained the same including the requirement of showing only misconduct, negligence and inattention to duties. Within the same Act[43] that dropped "manslaughter" from Section 1115 but left its scienter unchanged, Congress completely rewrote the general manslaughter statute and dropped its specific intent scienter of "unlawfully and willfully." The relevant part of Section 1112's current iteration defines involuntary homicide or manslaughter as follows:

> Involuntary - In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

---

[43] 18 U.S.C. § 1112 is the direct descendant of Section 274 of the Act "to revise, codify, and amend the penal laws of the United States, March 4, 1909." Chapter 321, 35 Stat. 1143. The 1909 law was the culmination of years of drafting and research. <u>See</u> <u>United States v. Alexander</u>, 471 F.2d 923, 944, FN 54 (1972) (description of legislative history of text of 18 U.S.C. § 1112). It resulted in the complete rewrite of the general manslaughter statute and a slight revision to Section 1115.

Given the stark differences in their plain language describing scienter and their legislative histories regarding the drafting of such scienter, defendant incorrectly argues that the text of Section 1115 does not prescribe a lower standard of care than Section 1112. Section 1115 does prescribe a lower mens rea threshold for conviction, as it has from the very beginning, exactly as Congress intended it and wrote it.

There are other fallacies to defendant's argument.  The Section 1112 general manslaughter statute applies to all persons, regardless of where the offense occurred or whether the offender had any unique responsibility or duty towards the victim of the crime.  By contrast, the relevant portion of Section 1115 applies to a narrowly tailored group of persons -- captains, engineers, pilots, or other persons employed on a steamboat or vessel -- all of whom are in positions that directly impact the health and welfare of passengers in their care.  Section 1115 was enacted by Congress in 1838 as a direct response to a seemingly endless series of catastrophic accidents that occurred with the expansion of steamboat travel and commerce on the nation's waterways.  See United States v. Holmes, 104 F. 884, 885 (C.C. Ohio 1900).  As such, Section 1115 is fairly described as one of the earliest examples of a regulatory or public welfare offense designed to prevent and proscribe an extremely limited class of conduct -- an aim wholly unlike that of the universally applicable, general manslaughter statute.  Section 1115 is not grounded in the principles of federal common law, like Section 1112, which is why a different negligence standard applies.

Finally, the Constitution does not mandate some general requirement that a heightened mens rea beyond negligence be alleged

1   or proven to criminalize conduct.  _Alvarez_ rejects defendant's
2   argument that the Constitution requires an allegation and proof of
3   "gross negligence" to sustain a conviction under Section 1115.
4   _Alvarez_, _supra_, 809 Fed. Appx. at 569.  Defendant Alvarez argued,
5   unsuccessfully, that he was convicted of simple negligence in
6   violation of the Constitution, which he argued required proof of a
7   higher level of mens rea.  Defendant's efforts to distinguish _Alvarez_
8   do not hold water.  The constitutional analysis of Section 1115 and
9   the statute's required mens rea in _Alvarez_ is squarely on point.  _Id_.
10  at 569.

11      Defendant's challenges to the Fifth Circuit's _O'Keefe_ decision
12  on the basis that it is unconstitutional by reference to isolated
13  snippets of language from the Supreme Court cases _Morrisette_,
14  _Staples_, _Elonis_, and _Ruan_ is also misplaced.  Defendant's citations
15  to _Morrisette_ are misleading and incomplete, and the decisions in
16  _Staples_, _Elonis_, and _Ruan_ are inapposite because they deal with the
17  Supreme Court's efforts to determine what scienter should be implied
18  in particular criminal statutes where Congress did not explicitly
19  make its intent clear in the text of the statutes themselves.  _See_
20  _Staples v. United States_, 511 U.S. 600 (1994) (Supreme Court imposes
21  general criminal intent mens rea standard to National Firearms Act
22  statute addressing criminal possession of machine gun where statute
23  was silent as to the standard that Congress intended); _see also_
24  _Elonis v. United States_, 575 U.S. 723 (2015) (overruling Third
25  Circuit Court of Appeals' imposition of negligence mens rea standard
26  into 18 U.S.C. 875(c), where statute itself prescribes no mens rea at
27  all); _United States v. Ruan_, 142 S.Ct. 2370, 2371 and 2376 (2022) (21

28

U.S.C. § 841's "knowingly or intentionally" mens rea applies to the statute's "except as authorized" clause).

**IV.   CONCLUSION**

    For the foregoing reasons, the government respectfully requests that this Court deny the Motion.